# PLAINTIFF, HAYDEN SCOTT ROSE'S DEPOSITION (PAGES CITED)

1    not current.  Did I read that correctly?

2         A.    You did.

3              (Whereupon, Rose Deposition Exhibit No. 3 was

4    presented to the witness for identification.)

5    BY MS. BARANYAI:

6         Q.    Okay.  Can you do me a favor and pull up -- it

7    will be Exhibit R, which is just the second attachment that

8    I had sent to Mr. Perry.  It is a copy of what I believe to

9    be the Google review.

10        A.    Okay.  I pulled it up.

11        Q.    Okay.  Can you just take a quick look at that

12   real quick and let me know if that is an accurate

13   representation of the review?

14        A.    It appears to be.

15        Q.    Okay.  In response to your review, CAM indicated

16   that you had failed to pay the special assessment for deck

17   repairs as assessed by the board of directors to all owners

18   with decks.  Is that statement true?

19        A.    Is the statement that CAM made true, or is your

20   reading of it correct?

21        Q.    Is the statement that CAM made true, that you

22   have failed to pay the Presque Isle special assessment for

23   deck repairs as assessed by the board of directors?

24        A.    I'm not sure exactly if that would qualify as an

1  assessment. It is true that I failed to pay it.

2      Q.   Okay. Their second -- No. 2 where they write

3  "Deck repairs were completed throughout the community, not

4  just your unit," is that statement true?

5      A.   I don't have personal knowledge. I believe that

6  they did it on maybe five or six decks.

7      Q.   I'm sorry. You broke up a little bit. You did

8  say you believe they were doing work on five or six decks?

9      A.   Correct.

10     Q.   Okay. Thank you. No. 3. It says "Your account

11 is currently with the attorney for collections pursuant to

12 the board of directors collection policy." Is that

13 statement true?

14           MR. PERRY: Objection. Calls for speculation.

15           THE WITNESS: It was true that my account was

16 with the attorney for collections. I'm not sure on the rest

17 of the statement.

18 BY MS. BARANYAI:

19     Q.   Okay. No. 4 says "Because you are in

20 collections, the association website account and payment

21 section is unavailable to you." Is that statement true?

22           MR. PERRY: Again, it's speculation.

23           THE WITNESS: I'm not sure of the reason that

24 they disabled my website services. That was their

# ATTORNEY MICHAEL GANLEY'S DEPOSITION (PAGES CITED)

1      A    Yes.

2      Q    All right.  "The lien for each unit as

3    described in Paragraph 9 above shall be based on the

4    percentage share in common areas as described in

5    Paragraph 7 and 8 above."  Did I read that accurately?

6      A    Yes.

7      Q    That controls -- would you say that's the

8    controlling law on this?

9              MR. RACINE:  Objection.

10             THE WITNESS:  Well, I mean, it's not a

11   law.  It's ---

12     Q    (Mr. Perry)  Well, you're right.  I misstated.

13   Does this Declaration control?

14     A    Does the Declaration control for Presque Isle

15   Villas?

16     Q    Yeah.  How Presque Isle would file a lien, the

17   actions that Presque Isle would take in regards to Mr.

18   Rose concerning the deck repairs and the liens to put

19   on the condominium for the deck repair, all of the

20   things that Presque Isle and CAM are doing here

21   regarding these repairs and the liens -- would you say

22   that this Declaration controls their action?

23     A    Yes.

24             MR. RACINE:  Objection.

25             THE WITNESS:  Well, objection, but yeah.



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444


Case 1:22-cv-00478-WO-JEP   Document 41-2   Filed 05/04/23   Page 5 of 26

1  The Declaration, in conjunction with federal statutes

2  and the state statutes, by-laws, rules and regulations,

3  do control Presque Isle Villas.

4               MR. PERRY:  Thank you.  And Russ, just

5  to clarify, what was the objection?

6               MR. RACINE:  I think your question

7  was ---

8               MR. PERRY:  I know it was terribly

9  worded.  I know that, and I'm sorry.

10              MR. RACINE:  That was basically it.  I

11 mean, I think the witness's answer demonstrated his

12 comprehension of my objection, and so I think it's

13 fine.

14              MR. PERRY:  Thank you.  Now we're going

15 to go to Exhibit D.

16                   (DEPOSITION EXHIBIT

17                   NUMBER 11 WAS MARKED

18                   FOR IDENTIFICATION)

19              MR. PERRY:  Have we gotten everything

20 in, Madam Reporter?  Is there -- are there any

21 documents that are hanging out there?  Thank you.

22              THE COURT REPORTER:  We're all good.

23      Q   (Mr. Perry)  All right.  So Exhibit D will be

24 the next one entered into evidence here -- into the

25 record.  So can you see that December 15, 2020 letter?



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1       A    No.

2                   MR. PERRY:  Thank you.  So now we're

3       going to pull up Exhibit C.

4                        (DEPOSITION EXHIBIT

5                        NUMBER 9 WAS MARKED

6                        FOR IDENTIFICATION)

7       Q    (Mr. Perry)  Can you see it?

8       A    Yes.

9       Q    Do you recognize that as a true and accurate

10      copy of the Declaration of Condominium?  And you can

11      scroll through if you need to.

12      A    Yes.

13      Q    All right.  So let's go to Section 5, second

14      paragraph.  You know what, I'm sorry.  It should be

15      Section 6.  Go to Section 6.  Now, I'm going to start

16      reading, and if you can read along with me -- right

17      there, the beginning of Section 6.

18                  "Limited Common Areas and Facilities shall

19      mean and include those common areas and facilities

20      reserved for use by a certain Unit or Units to the

21      exclusion of other Units, including any deck, porch,

22      patio, courtyard, balcony, foyer or carriage -- of

23      carriage units, rear yard, driveway, HVAC unit and/or

24      storage room appurtenant to such of the Units as are

25      shown on the Plans, or any assigned garage or assigned



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

Case 1:22-cv-00478-WO-JEP   Document 41-2   Filed 05/04/23   Page 7 of 26

1    storage room."  Did I read that accurately -- that part

2    of it?

3        **A    Yes.**

4        Q    So is any deck included in the definition of

5    limited common areas and facilities?

6        **A    Yes, deck is included in the definition of**

7    **limited common areas and facilities.**

8        Q    In fact, does it say, "Any deck"?

9        **A    Any deck, yes.**

10       Q    Thank you, sir.  Would Mr. Rose's deck be

11   included in that?

12       **A    Yes.**

13       Q    Does it continue by saying -- let's see,

14   cleanliness.  We're going to go down to the word --

15   "The cleanliness."  If you look at the tenth line down,

16   see where it says, "The cleanliness" on the far left?

17       **A    Yes.**

18       Q    I'll read.  "The cleanliness and orderliness

19   of the Limited Common Areas and Facilities shall be the

20   responsibility of the individual Unit Owner, but the

21   responsibility for maintaining, painting, repair and

22   replacement thereof, together with control over the

23   exterior decoration of the same, shall be and remain

24   with the Association, but each Unit Owner shall be

25   responsible for repair maintenance of that Unit's HVAC



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        Q    (Mr. Perry)  All right.  Thank you.  Does the

2   letter state that, "The association has the authority

3   to have the work done and bill the owner.  $4,900

4   estimate provided"?  I'll direct your attention to the

5   bolded paragraph at the top right, under, "Dear Hayden

6   Scott Rose."

7        **A    And I'm sorry, now -- now that I've been**

8   **redirected to that paragraph in the letter, can you**

9   **repeat your question?**

10       Q    Does the assoc -- does the letter state that,

11  "The association has the authority to have the work

12  done and bill the owner.  $4,900 estimate provided"?

13       **A    I mean, that's what it says on there.  "The**

14  **association has the authority to have the work done and**

15  **bill the owner."  "$4,900 estimate provided."**

16       Q    Thank you.  Did CAM or Presque have the

17  authority to do that?

18       **A    I -- my argument would be yes.  I mean, there**

19  **is a colorable argument that they have that authority.**

20       Q    All right.  So again, for Question 30 -- and

21  you can look at it or trust me to read it accurately.

22  The claim was, "On March 7, 2019, BHS informed the

23  other Defendants by letter that Presque was responsible

24  for paying for any work on the building's gutter and

25  exterior walls."


Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1         THE WITNESS:  I'm sorry.  I'm going to

2    need you to rephrase.

3         Q    (Mr. Perry)  Well, so I had asked, "Did you

4    advise," and you said, "I don't think I was ever

5    asked."  So if you weren't asked, would you agree you

6    didn't advise, or would you say maybe you did and don't

7    remember?

8         A    If I -- I'm sorry.  It's kind of a compound

9    question.

10        Q    It is a bit of a compound question.  So we can

11   back up.  Let's start from square one again.

12        A    Yes, if you wouldn't mind.

13        Q    All right.  Did you advise Presque that the

14   debt was valid and could be collected?  And when I say

15   "debt," obviously I mean the debt that's relevant to

16   the claims that we're making.  As attorneys, I'm kind

17   of skipping some basic facts, and maybe I shouldn't.

18             So the debt we're talking about is the debt

19   -- the assessment for the deck repairs and the

20   associated collection fees and attorney's fees and all

21   the fees that went -- developed from the deck repairs.

22   When I say "debt," that's what I'm talking about today.

23   So with that understanding, did you advise Presque that

24   the debt was valid and could be collected?

25        A    I do not believe I received the question from



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1  Presque in that exact manner, whether it was valid and

2  could be collected.  My standard response, when I was

3  asked whether the amounts could be added to the ledger,

4  is that there's ambiguities both ways.  That it could

5  be collected -- a judge could find it collectible.  A

6  judge could also find it not collectible.  But there is

7  a colorable argument that, yes, number one, it is a

8  valid debt.  And there is a colorable argument that,

9  yes, it can be collected in a like manner as an

10 assessment.

11      Q   Thank you.  What steps did you take to collect

12 the debt?

13      A   We ---

14              MR. RACINE:  Objection.

15              MR. PERRY:  Go ahead.

16              THE WITNESS:  Should I go ahead and

17 proceed?

18              MR. RACINE:  Yeah, I'm sorry.

19              THE WITNESS:  Sure.  We originally

20 received the account emailed to us by Community

21 Association Management.  We received a directive from

22 Community Association Management to file a lien for the

23 balance that was stated in the ledger.  We had filed a

24 lien in the matter, and there was correspondence with

25 Mr. Rose.  We were later directed by the Association --



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    A    Okay.   Section 6 of the Declaration defines

2    decks as limited common areas or facilities, which is

3    accurate.   And that 47C-3-115(c)(1) provides ---

4    Q    I'm sorry, let me stop you for a second.   I

5    don't want you to have to answer more than I actually

6    asked.

7    A    Okay.

8    Q    Just for that second sentence there.   "He has

9    confirmed that the Association has the authority to

10   dispatch a vendor.   However, the owner is responsible

11   for the cost of limited common element expenses."  So I

12   was just asking what they mean by that.   And if you

13   were explaining what they mean by that, then I

14   understand.   I'll let you go, but I just didn't want

15   you to have to say more than you needed to say.

16   A    Okay.   I mean, it appears that it's saying

17   that the Association is responsible to perform the

18   maintenance, but the cost would be billed back to the

19   owner.

20   Q    Okay.   Did you advise Mr. -- did you advise

21   Presque that Mr. Rose would have to pay for the

22   repairs?

23   A    It's -- what I'd advise Presque is that

24   there's an ambiguity in the Declaration.   Typically,

25   limited common elements are the financial



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
1   responsibility of the homeowner.  The Association

2   performs the repairs, bills those limited common

3   elements back to the homeowner.  There is a colorable

4   argument that, under the Condominium Act -- that since

5   the decks are identified as a limited common area under

6   the Declaration, that the cost for the repair of those

7   limited common areas are the responsibility of the

8   owner.

9        Q   Of the individual owners?  Is that ---

10       A   Correct.

11       Q   --- what you're saying?  At any point, did you

12  tell your client, "This lawsuit is not worth it"?  And,

13  "It's" ---

14            MR. RACINE:  Objection.

15       Q   (Mr. Perry)  --- "only $7,000, that maybe we

16  shouldn't go into all this expense of legal fees and

17  all this over a $7,000 deck where you don't really know

18  who should be paying for it"?

19       A   I ---

20            MR. RACINE:  Objection.

21            MR. PERRY:  Well, you asked for

22  attorney's fees, so I'm going to ask that question.

23            THE WITNESS:  I'm sorry, I -- can you

24  clarify?  I'm sorry.

25       Q   (Mr. Perry)  The counterclaim has asked for
```



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

Case 1:22-cv-00478-WO-JEP   Document 41-2   Filed 05/04/23   Page 13 of 26

1       A    I would provide options.

2                MS. BARANYAI:  Okay.  Thank you.  Sorry,

3    that's all I've got, Russ.

4                MR. RACINE:  All right.  Hold on one

5    moment.  Actually, we'll reserve all our questions for

6    trial, so I have no questions.  Shane, you're on mute.

7                MR. PERRY:  Thanks, sorry.

8                    **FURTHER EXAMINATION**

9    **BY MR. PERRY:**

10      Q    I just have one redirect.  Did Presque follow

11   your advice in this case?

12               MR. RACINE:  Objection.

13               MR. PERRY:  They waived privilege.  I

14   don't know if that's a privilege objection or what the

15   objection is.

16               MR. RACINE:  I mean, over the years, he

17   must have given a lot of advice.  I think you maybe

18   need to narrow ---

19               MR. PERRY:  Are you answering for him?

20               MR. RACINE:  No, but you asked about my

21   objection, so.

22      Q    (Mr. Perry)  All right.  So let me ask you

23   this: did Presque follow your advice on whether or not

24   to collect this debt?

25      A    Well, I mean, what I did is I provided the



1    options to them where for -- that there is a colorable

2    argument that these amounts can be assessed to Mr.

3    Rose, but there is a risk with that and there could be

4    potential liability down the line.  So it was less

5    about following a directive.  I'll put it like this: I

6    did not provide a directive.  There wasn't an option

7    there that was provided along with certain color as to

8    potential benefits and consequence of that option.

9        Q   Has Presque noticed a possible malpractice

10   claim in this?

11               MR. RACINE:  Objection.

12               MR. PERRY:  What's the objection?

13               MR. RACINE:  Well, it's not under the

14   topics of the 30(b)(6).  It's outside the scope.

15               MR. PERRY:  I'll ask anyway.

16       Q   (Mr. Perry)  Has Presque noticed BHS about a

17   possible malpractice claim dealing with these facts in

18   the suit?

19               MR. RACINE:  Objection.

20               MR. PERRY:  You can answer.

21               MR. RACINE:  If you know.

22               **THE WITNESS:  So far as I'm aware, no.**

23               MR. PERRY:  All right.  Thank you.

24               MR. RACINE:  Everybody done?

25               MR. PERRY:  Yeah, we're done.



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1   regarding such an interpretation or not."

2       Q   As a 30(b)(6) witness, you understand that you

3   are supposed to testify as to what the company was

4   thinking -- what BHS was thinking at the time, and how

5   it felt about this situation.  Do you understand that?

6       A   That is correct.

7       Q   Okay.  So what was BHS trying to tell the

8   client -- my client, Mr. Rose, about what was going to

9   happen if he didn't pay?

10      A   What we were trying to -- excuse me.  What we

11  were trying to say is that per Section 9 of the

12  Declaration, as well as the General Statutes, the

13  regular and special assessments constitute a lien and

14  that the HOA can pursue a claim of lien or a

15  foreclosure of the property.  That is what we are

16  trying to communicate.

17      Q   So they have the power to do that?

18      A   That they can pursue a claim.

19      Q   Sure.  And what does it say -- tell him to do

20  to avoid that claim?

21      A   Submit payment of the amount owed to the HOA.

22      Q   Does it say he could do anything else to avoid

23  the lien?

24      A   It does not.

25      Q   Does it even say, "You need to pay whether you

02-17-23                    Rose v. Presque Isle                    COPY



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    Q   Let's go to the document that says

2  "2021.6.22."

3    **A   Yes.**

4                    (DEPOSITION EXHIBIT

5                    NUMBER 13 WAS MARKED

6                    FOR IDENTIFICATION)

7    Q   (Mr. Perry)  The Bagwell Holt collection note.

8  You can see that?

9    **A   Correct.**

10   Q   Okay.  And do you recognize that?

11   **A   Yes.**

12   Q   Now, the third paragraph -- well, I'll just

13 read the third paragraph.  "While it is understood that

14 your personal" -- well, you know what, I'm -- strike

15 that.

16       I don't want to read the whole thing.  I'm

17 just going to start at the Board.  "The Board intends

18 to pursue" -- follow along and let me know if you don't

19 see it.  "The Board intends to pursue collection of any

20 assessment to your unit, in the event such assessments

21 are not paid in a timely fashion.  Per Section 9 of the

22 Declaration, as well as the NC Gen. Stat. Section 47C-

23 3-116, the regular and special assessments of the HOA

24 constitute a lien on your property.

25       "The HOA can pursue a claim of lien or a



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

Case 1:22-cv-00478-WO-JEP   Document 41-2   Filed 05/04/23   Page 17 of 26

```
 1   foreclosure of the property to secure any debt that is

 2   owed.  If you wish to avoid the HOA's claiming of a

 3   lien on your property and/or the foreclosure process,

 4   you may submit payment of the amount owed to the HOA,

 5   whether you maintain a protest regarding such an

 6   interpretation or not.  The Board will have Pro Fixer

 7   contact you to schedule work on your unit.  Thank you."

 8   Did I read that accurately?

 9        A    Yes.

10        Q    All right.  Is that a threat of foreclosure?

11               MR. RACINE:  Objection.

12               MR. PERRY:  What's the objection?

13               MR. RACINE:  I think you need to define

14   "threat" a little more accurately.  I mean, it states

15   what it states.  But ---

16               MR. PERRY:  Are you answering for him?

17               MR. RACINE:  No, sorry.  Objection.

18   Please answer if you can.

19        Q    (Mr. Perry)  Yes.  Is that a threat of

20   foreclosure?

21        A    I would not necessarily call it a threat.

22   It's a statement.  It is what ---

23        Q    Okay.

24        A    --- it says.

25        Q    All right.  Is it a promise?
```



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1      A    If he was not responsible for the deck repair,

2    then the HOA performed the repair -- excuse me.  If he

3    was not responsible for the cost of the repair, the HOA

4    performed the repair and billed the cost back to him,

5    then those costs should not appear on his ledger.

6      Q    So would you agree they wouldn't be able to

7    foreclose on that?

8      A    Not on the cost of those repairs.  They

9    wouldn't be able to file a lien, and then the HOA would

10   not be able to foreclose on that lien.

11     Q    Or file ---

12     A    But again ---

13     Q    I'm sorry.

14     A    That's presupposing that that language ---

15     Q    Sure.

16     A    --- is in the Declaration.

17     Q    And they would not be able to collect legal

18   fines and fees?

19     A    Correct.

20     Q    Or report it as late on a credit report?

21     A    Correct.

22     Q    So why did BHS not foreclose on the property?

23     A    We were directed by the Association to proceed

24   with foreclosure.  We had sent a pre-foreclosure

25   letter, which is a requirement under the North Carolina



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1   General Statutes prior to instituting a foreclosure.

2   That statute states that a foreclosure needs to be

3   filed within 30 days of the date -- excuse me, 45 days

4   of the date of that letter.  We had sent the letter, I

5   want to say, on or about January 5th.

6           Approximately two weeks after we sent that

7   letter, we did perform a title search, which is

8   something that we do in anticipation of filing

9   foreclosure, but a new attorney representing Mr. Rose

10  reached out to us.  And so whenever we have an

11  attorney, or even the individual homeowner for that

12  matter, reach out to us, we put everything on hold and

13  attempt to -- attempt to work it out without filing

14  foreclosure.

15      Q    All right.  And so -- but at this point, no

16  one, BHS, Presque, CAM -- none of those parties have

17  filed a lien -- I'm sorry, filed a foreclosure -- have

18  moved forward with a foreclosure, have they?

19      A    Well, we sent the pre-foreclosure letter.  Was

20  a notice of hearing filed?  No.

21           MR. PERRY:  Yeah, okay.  So now we're

22  going to go -- and was that document admitted into

23  evidence?  Thank you.  Now we're going to go to the

24  10-21 -- I'm sorry, 2021-10-22 BHS Mail and Lien.

25  That's the next document.



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

Case 1:22-cv-00478-WO-JEP   Document 41-2   Filed 05/04/23   Page 20 of 26

# STACI GREEN'S DEPOSITION (PAGES CITED)

1        A    Well, responsibility and payment are two

2    different things.

3        Q    So you would say that the responsibility does

4    not include payment?

5        A    It doesn't say it there, no.

6        Q    Well, I'm asking what your opinion is.  Do you

7    think that being responsible for the repair of the deck

8    would mean that you don't pay for it?

9        A    Well, that's when we rely on advice of

10   counsel.

11       Q    So did counsel tell you that it was not your

12   duty to pay for it?

13       A    Well, it's ---

14            MR. RACINE:  Objection.

15            THE WITNESS:  It's indicated in the

16   chart.

17       Q    (Mr. Perry)  Well, we're talking about the

18   Declaration.  Would you say that the Declaration

19   controls over that chart?

20       A    The chart is a summary of the language in the

21   Declaration and state statute.

22       Q    But if there was a conflict between that chart

23   and the Declaration, which would control?

24            MS. BARANYAI:  Going to object.  You're

25   asking for a legal conclusion here.



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1          Q    (Mr. Perry)  Which would you follow?

2          **A    Well, if we're not sure, then we rely on the**

3   **advice of counsel.**

4          Q    Did you ask counsel about this?

5          **A    Yes.**

6          Q    And what did counsel tell you?

7                    MR. RACINE:  Objection.

8                    MR. PERRY:  You can answer.

9                    MS. BARANYAI:  I would say that one's

10   privileged ---

11                   MR. PERRY:  Okay.

12                   MS. BARANYAI:  --- communication between

13   attorney/client.

14                   MR. PERRY:  Sure.  Okay.

15          I think that when she says that she relied on

16   advice of counsel, I think she's waiving privilege on

17   that.  But -- so we'll ask for a supplement later if we

18   work that out.

19                   MS. BARANYAI:  Sounds good.  Thank you.

20                   MR. PERRY:  Sure.  I'm easy to get along

21   with.  So we'll go to -- and that's marked ---

22                   MS. BARANYAI:  Don't answer.  Sorry.

23   Sorry, I was just going to say you don't need to answer

24   that one.  I didn't follow up.  Sorry.

25                   MR. PERRY:  Sure.  And, Madam Reporter,



**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        A    No.

2        Q    Who is not a member of the Board or the

3    Association?

4        A    So I believe Tom is the person referenced with

5    the roofing company, and Carl was a Board member.  So

6    actually, I don't know the dates that any of them

7    began, so I can't speak to that either.

8        Q    All right.  Concerning Tom, and you said ---

9                THE WITNESS:  Well, actually, can I

10   correct that?

11               MS. BARANYAI:  Yes.

12               THE WITNESS:  So when I look further

13   down -- so this is where it gets confusing.  So on the

14   results of voting, it appears that Tom is a Board

15   member, and I was looking at the section above for roof

16   where that person's name is Tom as well.  So let me

17   just clarify that, yes, all of those people who voted

18   are Board members.

19       Q    (Mr. Perry)  So Thomas McQueen was there, but

20   he's not listed under the attendees.  Is that accurate?

21       A    And so, again, I can't speak to -- I can speak

22   to who attended based on the attendees there, but I

23   can't speak to who left at what time because I wasn't

24   there.  So it's possible that Carl and Thomas McQueen

25   left after the roof discussion, but I can't speak to

---



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    BY MR. PERRY:

2        Q    I have a quick redirect after that.  Do all of

3    the owners have keys to the clubhouse?

4        **A    They should.**

5        Q    So any owner can access that conference room.

6    Is that correct?

7        **A    Depending on if it's locked or not locked.**

8        Q    Do they have a key to the conference room?

9        **A    Owners should not.  I can't speak to that.  I**

10   **don't know.**

11       Q    Do you know whether the conference room stays

12   locked or not?

13       **A    I believe -- well, again, I can't speak**

14   **directly to it.  I don't know.**

15       Q    Okay.  That's good enough.  Thank you.

16            MS. BARANYAI:  Okay.  Anybody --

17   anything else?

18            MR. RACINE:  Not for me.

19            MS. BARANYAI:  All right.  Well, I

20   believe we're all finished up.

21

22            WHEREUPON, at 11:27 o'clock a.m., the

23   deposition was adjourned.

24

25

**02-16-23**        **Rose v. Preseque Isles Villas**              COPY


Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
 1        Q    So does the letter state that the Association
 2   has the authority to have the work done and bill the
 3   owner $4900 estimate provided?
 4        A    Can you enlarge it?
 5        Q    Scroll down.
 6        A    So it says the bid covers the cost of labor,
 7   and it gives a range pending unforeseen problems, and
 8   then the deadlines are reiterated again.
 9        Q    Okay.  Did CAM or Presque have the authority
10   to do this?
11        A    Yes.
12        Q    Now, so --
13             MR. PERRY:  -- you can take that off.
14        Q    (Mr. Perry)  Going to go to -- you know, I
15   should have had the Complaint, but I'll -- I don't
16   think you need to see it for this.  I know I said I was
17   going to be fast enough.  Not fast just now, but I will
18   be.  Give me just a minute.  Sorry.
19             MR. RACINE:  While we're waiting, Shane,
20   you said you uploaded these exhibits.
21             MR. PERRY:  Yeah.
22             MR. RACINE:  Is there a -- is there a --
23   was there a link or something that was circulated?  I
24   must have missed it.
25             THE COURT REPORTER:  Do you want to go
```



**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444